**Audrey LeSAVAGE and Bernard LeSavage, Plaintiffs-Appellees,**

v.

**Gerald WHITE and Phyllis White, James E. Carpenter, Pasco County, Defendants-Appellants.**

**Bernard LeSAVAGE, Plaintiff-Appellant,**

v.

**James CARPENTER, Gerald White and Phyllis White, Defendants-Appellees.**

Nos. 82–3177, 83–3172.

United States Court of Appeals, Eleventh Circuit.

March 20, 1985.

---

**815**

Julius F. Parker, Jr., Tallahassee, Fla., for Carpenter.

Eloise Taylor, Asst. County Atty. New Port Richey, Fla., for Pasco County.

Herman B. Blumenthal, III, Largo, Fla., Robert W. Morrison, Tampa, Fla., for LeSavage.

Before GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges.

GODBOLD, Chief Judge:

This appeal is from judgments in favor of plaintiffs against a deputy sheriff and two neighbors of plaintiffs, a judgment against the county for attorney's fees on 42 U.S.C. § 1983 claims, and a malicious prosecution claim and a common law battery claim. We reverse the § 1983 judgments and the malicious prosecution judgment and affirm the common law battery judgment.

Gerald and Phyllis White and Bernard and Audrey LeSavage lived one home apart in a residential subdivision in Pasco County, Florida, and carried on a mostly petty feud beginning in 1979 and extending to trial of this case. The county sheriff's office was called to the scene repeatedly over a period of two to three years to attempt to deal with incidents, some trivial, others serious, between the two sets of

neighbors. Against this background the neighborhood fracas occurred that brought on this suit by the LeSavages against the Whites, the county sheriff, and four deputies. The suit ended in substantial judgments against Deputy Carpenter, a substantial judgment against the Whites, a judgment against the county for attorney's fees, and an argument over execution of the judgment against the Whites.

We have sorted through a record of almost unbelievable complexity and confusion to determine what was claimed, what was tried, and what was submitted to the jury. We reverse all the judgments except a judgment of $1,500 in favor of Audrey LeSavage against Deputy Carpenter for common law battery.

In August 1979 Pasco County Sheriffs Blevins and Tucker responded to a complaint and found Audrey LeSavage riding a tricycle around and around making faces at people and acting upset and very hostile towards the Whites. They took her into custody under the Florida Mental Health Law, known as the Baker Act.[1] She was evaluated by a person designated by the County Mental Health Department and transferred to a hospital where she was kept for five days and then released. She was initially very hostile in the hospital and refused to answer any of the doctor's questions. The doctor's reports stated that she was not suffering from any psychiatric illness.

During the succeeding year the sheriff's office responded to an estimated 20 complaints arising from the friction between the LeSavages and the Whites (and at times involving other neighbors as well).

The incident that triggered the filing of this suit took place in October 1980. The Whites complained to the sheriff's office that Bernard LeSavage had struck both of them with a lawn sprinkler. Bernard complained that Gerald White came onto his property with a knife, shouting epithets at him, and that he raised the lawn sprinkler to protect himself. Audrey LeSavage called the sheriff's office. Deputy Vaughn investigated and filed two reports, one in which Gerald is the complainant, alleging Bernard hit him with the sprinkler, and another in which Bernard is the complainant, alleging Gerald threatened him with a knife. Both reports describe the subject matter as "aggravated assault: referral." In both reports Vaughn stated that he had spoken with all involved parties and had set up an appointment with a state's attorney to take testimony and clarify the facts.

Deputy Carpenter had been assigned by the sheriff's office to handle all complaints from the LeSavages and the Whites. Gerald White testified that, as best he could remember, Carpenter had told both White and LeSavage that "the next person that committed a crime he could prove, that person would be arrested." Tr. vol. 5 at 57. At trial White was questioned about an earlier deposition in which he had stated

1. This Act, Fla.Stat.Ann. §§ 394.453–.4785 (1984) provides in relevant part:
   394.463 Involuntary examination.
   (1) Criteria.—A person may be taken to a receiving facility for involuntary examination if:
   (a) There is reason to believe that he is mentally ill;

   .    .    .    .    .

   (c) He is unable to determine for himself whether examination is necessary, and;
   1. Without care or treatment, he is likely to suffer from neglect or refuse to care for himself; such neglect poses a real and present threat of substantial harm to his well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or

2. It is more likely than not that in the near future he will inflict serious, unjustified bodily harm on another person, as evidenced by behavior causing, attempting, or threatening such harm, including at least one incident thereof within 20 days prior to the examination.
   (2) Involuntary examination.—
   (a) *Initiation of involuntary examination.* —An involuntary examination may be initiated by any one of the following means:

   .    .    .    .    .

   2. A law enforcement officer may take a person who appears to meet the criteria for involuntary examination into custody and deliver him or have him delivered to the nearest receiving facility for examination.
   . . . .

that Carpenter said "I guarantee you that the first one of you people to get out of line is going to jail." Tr. vol. 5 at 57. Bernard testified that Carpenter had made a statement to the effect that the next person that stepped out of line in Viva Villas (the residential area) would be arrested if he could prove it. Tr. vol. 4 at 189. Carpenter testified that he had said that if there were "any violations of the law, enforcement action would be taken." Tr. vol. 4 at 245.

According to Carpenter, when he arrived at work on October 15, the day after the incident, he found only Vaughn's report based upon the complaint by White that Bernard had hit him with the sprinkler. Carpenter spoke with White and with two witnesses who had observed the lawn sprinkler incident and whose statements were consistent with White's. Carpenter then spoke with two assistant state's attorneys who decided to press charges against Bernard for battery. Carpenter signed an affidavit prepared by the state's attorneys office and submitted it to a judge who issued a warrant authorizing Bernard's arrest for statutory battery.

Carpenter, accompanied by another deputy, went to the LeSavages' home to execute the warrant. While the deputies arrested Bernard, Audrey tried to grab away from Carpenter the lawn sprinkler, which he had picked up in the garage. He told her that he was taking the lawn sprinkler as evidence. Audrey then called her neighbors, the Marcottes. Mr. Marcotte arrived at the LeSavages' within a few minutes; he saw Bernard in the front yard, handcuffed and in the custody of a deputy, and heard Audrey crying.

Mrs. Marcotte arrived a few minutes later. She entered the garage area and found Audrey sitting in a chair crying, with Carpenter standing nearby. Mrs. Marcotte later testified that Audrey was upset but lucid and in control of herself. Mrs. Marcotte and Audrey went inside for ten minutes. Audrey dressed and gave Mrs. Marcotte instructions concerning the LeSavages' dog and house.

At some point, as Carpenter was exiting the house, Audrey slammed the door. Carpenter testified that Audrey slammed the door on his arm and shoulder, injuring him, which Audrey denied. Carpenter decided to take Audrey and commit her for observation under the Baker Act. The deputies took the LeSavages to the sheriff's compound. Mr. Marcotte posted bond for Bernard and he was released. The charges against Bernard were subsequently dropped on speedy trial grounds.

A social worker employed by the county examined Audrey, then she was taken to a hospital for injuries she claims to have suffered when Carpenter had grabbed her by the arm to take her into custody. After leaving the hospital, pursuant to the Baker Act, she was taken to the same hospital in which she had been under observation a year earlier. A few hours after Audrey's arrival she was seen by the same doctor who had seen her in 1979. He kept Audrey overnight and released her the following afternoon. He explained that he did not release her sooner because of the paperwork involved.

The LeSavages sued the Whites, the sheriff and four deputies in three counts alleged to arise under 42 U.S.C. § 1983. Either before or at trial counts were restated, renumbered, and some dropped from the case. A directed verdict was entered for all defendants charged with participation in taking Audrey into custody in 1979. The court also directed a verdict on a charge that Carpenter had conspired with the Whites in the October 1980 arrest of Bernard and commitment of Audrey.

The case was tried before a jury. One of the claims, a malicious prosecution claim against the Whites, was tried over their objection because they contended it had been removed from the case by agreements reached in pretrial orders. The sheriff and three deputies were dropped out of the case by dismissal before trial or on directed verdict.

The jury returned verdicts producing judgments as follows

—On Count 1, for Bernard LeSavage, against Carpenter, for "false imprisonment, arrest[ed] without probable cause," $7,000.

—On Count 2, for the . LeSavages, against Carpenter, for "taking Audrey into custody under the Baker Act and in violation of due process," $75,000.

—Count 3, for the LeSavages, against Carpenter, for battery by use of excess force when taking Audrey into custody, $1,500.[2]

—Count 4, for the LeSavages, against the Whites, for malicious prosecution, $25,000.

After trial the court entered judgment in favor of the LeSavages against Pasco County, not a party to the suit, for attorney's fees on the § 1983 claims, under 42 U.S.C. § 1988.

The LeSavages sought a writ of execution against the Whites and began proceedings to execute their $25,000 judgment. Phyllis claimed a homestead exemption. The court found that she was entitled to it.

Carpenter and the Whites appealed. The county was granted leave to intervene for purposes of appeal and questions the assessment of attorney's fees against it. The LeSavages sought to appeal from the district court's failure to grant them an evidentiary hearing or to allow additional discovery on the homestead issue.

The judgments against Carpenter based on false arrest of Bernard and taking Audrey into custody under the Baker Act

must be reversed and judgment entered for Carpenter. We affirm the judgment against Carpenter on the claim of common law battery by Audrey. We reverse the judgment against the Whites for malicious prosecution and direct entry of judgment for the Whites.

I. The § 1983 claim based on false arrest of Bernard

■ This claim is an effort to assert a § 1983 cause of action against Carpenter for his alleged omissions or alleged improper state of mind relating to his procuring the warrant on the basis of which he arrested Bernard. The validity of the warrant is not otherwise questioned.[3] The matters complained of seem to be these: (1) Carpenter knew or should have known that the complaints by the Whites were not credible;[4] (2) Carpenter should have obtained the offense report on the complaint filed by LeSavage; (3) Carpenter should have spoken with Vaughn, the investigating officer, and should have abided by the recommendation of a referral; (4) Carpenter had threatened White and LeSavage with arrest; (5) Carpenter attempted to procure a warrant for aggravated assault; and (6) there were inaccuracies in Carpenter's affidavit.

■ This circuit has not squarely decided whether an officer who procures the issuance of an otherwise valid warrant may be subject to § 1983 liability for some omission or for some improper state of mind in the procurement process.[5] Assuming ar-

2. Bernard was included in the judgment because he claimed loss of consortium and the court instructed the jury on his claim.

3. This characterization is as good as we can muster. The LeSavages do not attack the sufficiency of the evidence presented to the judge to justify the existence of the warrant. See text above.

The probable cause issue should not have been submitted to the jury. Moreover, as a matter of law, there was probable cause to arrest Bernard for violation of Florida's battery statute, Fla.Stat.Ann. § 784.03 (1976). Carpenter's affidavit tendered to the judge showed that White had told Carpenter that Bernard had assaulted him with a lawn sprinkler and had injured him; that the LeSavage-White altercation

had been going on for the past year and had been escalating in intensity; that in the past year Carpenter had investigated at least 20 documented complaints involving the two families; and that Carpenter's opinion, based on the history of the feud, was that continued liberty of Bernard created an unreasonable risk of bodily harm to others.

4. Plaintiffs acknowledge that there was no substantial evidence that Carpenter gave false information to the state's attorney.

5. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), did not reach any question of an officer's § 1983 liability for procuring a warrant but concerned the liability of an official who for several days imprisoned an inno-

guendo that there can be such a cause of action, under *Boeing v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc), standards Carpenter was entitled to a directed verdict.

With respect to (1), above, Carpenter was not required to reject out of hand the complaint by White as frivolous or not credible, and in fact he proceeded to investigate it by going to the scene and talking to witnesses. His own incident report, filed after he went to the scene, described the long-running neighborhood battle between the

cent man arrested under a valid warrant. *Rodriguez v. Ritchey,* 556 F.2d 1185 (5th Cir.1977) (en banc), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 99 (1978), did not reach § 1983 liability for procuring a warrant when the wrong person was arrested under a valid grand jury charge. *Smith v. Gonzalez,* 670 F.2d 522 (5th Cir.), *cert. denied,* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982), held that there is no cause of action when the officer procuring the warrant arranged to have the complaining party relate the facts to an intermediary, a district attorney, who then filed an affidavit resulting in the issuance of the warrant by a judge. The independent decisions of the intermediaries broke the causal chain between the officer and any constitutional violation. *Baskin v. Parker,* 602 F.2d 1205, 1207 (5th Cir.1979) suggested that an officer may be liable for obtaining a warrant where he knew or should have known that the information supplied to him was based on personal grievances. *Cf. McKinney v. George,* 726 F.2d 1183 (7th Cir.1983) (rejecting the asserted liability of officers for not pursuing the truth of complaints supporting arrest and detention). Here Carpenter did pursue the complaint registered by White by talking to witnesses.

6.  The affidavit reads:
    Before me ... personally came Detective James Carpenter, who ... says that on the 14th day of October, 1980 ... one Gerald White ... stated to your affiant that he was assaulted by the defendant, Bernard LeSavage.... Mr. White stated to your affiant that he was having a verbal altercation with Mr. LeSavage, at which time Mr. LeSavage took a large, yellow plastic and aluminum oscillating lawn sprinkler approximately 12" in length and attempted to strike Mr. White. Mr. White raised his hand to protect himself and the defendant struck him on the hand with the sprinkler, causing injuries to his hand. Your affiant was told by Mr. White that this was done without his permission and consent. Your affiant also interviewed Lois Van Dyke and she advised that she observed the attack on Mr. White as described above.

two families. His affidavit in support of the arrest warrant noted that the altercation had been going on for the past year and had been escalating.[6] He set out that he had investigated a minimum of 20 documented complaints.[7] Apart from what was said in the affidavit, Carpenter had access to reported complaints by the Whites and other community members that Bernard possessed weapons, that he kept them in his car, and that he had walked around with a weapon in his hand and had raised it.[8]

Your affiant would also state that the altercation between Mr. White and Mr. LeSavage has been going on for the past year and has been escalating in intensity. Your affiant has investigated a minimum of twenty documented complaints and in your affiant's opinion, based on the long history of this feud, that [sic] the continued liberty of Bernard LeSavage constitutes an unreasonable risk of bodily injury to others.
The affidavit claimed that the actions of Bernard LeSavage were contrary to Florida's § 784.03, the battery provision.

7.  The dispute, which began with complaints about harassment and other minor acts, escalated through obscene and harassing phone calls (with police phone traces confirming calls from the LeSavages' house to the Whites), to charges of criminal mischief and destruction of property and personal threats. *See infra* note 8. A number of neighbors became involved. It is clear from the numerous complaints documented by the sheriff's office that neither the LeSavages nor the Whites were blameless for fueling the feud.

8.  Complaints had been filed that Bernard threatened Gerald one day after Audrey's first Baker Act admission in August 1979. Another report was filed in September by Francis Blassi, another neighbor, stating that Bernard had threatened him.

    In October 1979, Phyllis White complained that Bernard stated he would shoot the Whites' 16 year old daughter, Sharon, and her girl friend, Debbie, and put them in a pine box. The same deputy reported that another neighbor stated that he heard Bernard tell Gerald that "I will get you and put you in a pine box." Another witness said she heard LeSavage direct vulgar words at Sharon and heard him say that "he would kill all of them." In February 1980 White again complained that LeSavage called him and threatened "your [sic] dead."

    In May 1980 White filed a complaint that Bernard had pulled a rifle with a scope from a car, acted as though he was loading the weapon,

As to (2), Carpenter's failure to have in his possession the second offense report filed by Vaughn, which listed Bernard as the complainant, was at most negligence not of type or sufficiency to form the basis of a § 1983 claim in investigating an offense or procuring a warrant. *Baker v. McCollan*, 443 U.S. 137, 139–40, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 435 (1979); *Stadium Films, Inc. v. Baillargeon*, 542 F.2d 577, 578 (1st Cir.1976).

As to (3), there was no reason for Carpenter to speak with Vaughn. He had Vaughn's report in his hand. The report said "aggravated assault: referral." In context this meant "referred to the state's attorney's office." Carpenter, however, had been assigned by the sheriff the task of handling matters between the two feuding families. He proceeded to talk with White and then with Van Dyke and another witness, Mrs. Kinsella. No inference of impropriety may be drawn from his doing so. The "referral" to the state's attorney's office did not exclude further inquiry by Carpenter. Moreover, after going to the scene, Carpenter conferred with state's attorneys. They prepared Carpenter's affidavit to be presented to the judge. Thus, Carpenter conferred with the very office to which the matter had been "referred" and abided by the decision of that office that battery charges should be pressed.

With respect to (4) there was evidence that Carpenter had told both White and LeSavage that whoever got out of line was going to jail, or that if anybody violated the law enforcement action would be taken. These statements imply little, if any, more than that Carpenter would arrest either of them were they to break the law. They could not by themselves constitute a basis for liability for securing a warrant for the arrest of one of them supported by probable cause. Law enforcement officers may not be constrained, in the manner suggested by plaintiffs, from warning violators or putative violators that if they break the law they will be arrested.

As to (5), Vaughn's report referred to aggravated assault, and Carpenter attempted to procure a warrant for aggravated assault. The state's attorney recommended a warrant for battery and Carpenter secured a warrant for that charge. This in itself states no wrong.

As to inaccuracies, (6) above, no inaccuracies were shown.

Possibly what plaintiffs are urging is that (3), (4) and (5) are evidence of a bad state of mind by Carpenter that could alone support a jury verdict even though the warrant is supported by probable cause. Assuming there is a § 1983 cause of action based on improper intent in procuring a warrant, the alleged deficiencies in this case—to the extent they are even arguably deficiencies—are not, taken together, sufficient to permit a jury to infer any actionable wrong by Carpenter.

The trial court was required to grant a directed verdict. We need not rule upon whether a state action could be maintained for the way in which a warrant is obtained. *See e.g. Gallucci v. Melavic*, 100 So.2d 375, 377 (Fla.1958) (Florida cause of action for false arrest or false imprisonment for procuring warrant by fraud or other improper means).

It is not necessary to discuss Carpenter's claim to both absolute and qualified immunity.

■ The LeSavages contend that even if they did not make out a § 1983 claim for false arrest, the jury verdict should stand as an implicit finding of false arrest under state law. This is untenable. No such basis was pleaded, tried, or submitted to the jury on instructions.

---

and then pointed it at White. Bernard, when interviewed, claimed that he was only looking over his guns. The officer noted two guns, unloaded, lying on the back seat of the LeSavages' car.

These and other incidents brought considerable newspaper publicity. The family occupying the house between the squabbling families moved out to escape, and the house was resold at a depressed, bargain price.

II. The judgment against Carpenter under § 1983 for violation of Baker Act and for taking Audrey into custody in violation of due process

Audrey has not challenged the facial constitutionality of any portion of the Baker Act. Rather she complains that Carpenter's taking her into custody under the Baker Act violated her constitutional rights, giving her a cause of action under § 1983.

The special verdict asked the jury: "Have plaintiffs Bernard LeSavage and Audrey LeSavage proved that defendant James Carpenter falsely took her into custody in violation of the Baker Act and her due process rights?"

■ We overleap problems in the case of whether a due process claim was properly asserted and, if asserted, whether it was any broader than the violation of the Baker Act. We do so because under the objective standards of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), Carpenter enjoyed qualified immunity as a matter of law. The Court in *Harlow* said that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken, 'with independence and without fear of consequences.'" *Harlow* at 819, 102 S.Ct. at 2739, *citing Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). As one court has recently noted, "[t]his is a practical answer to a difficult question." *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir.1983). The question of qualified immunity under *Harlow* is one of reasonableness—would a reasonable person in Carpenter's shoes have known he was violating Audrey's constitutional rights? *Cf. B.C.R. Transport Co., Inc. v. Fontaine*, 727 F.2d 7, 10 (1st Cir.1984).

Carpenter knew of Audrey's past behavior in the long-simmering dispute with the Whites. *See* text preceding note 1, *supra.* He knew of the publicity surrounding the neighborhood dispute. He knew that Audrey had been committed once before under the Baker Act for several days following bizarre public behavior. He knew that there had been an affray between Bernard and Gerald, he had taken the sprinkler as evidence, and Audrey had attempted to take it away from him. He testified that she screamed at him to get out of her house and said other nonsensical things during Bernard's arrest. Tr. vol. 6 at 41. Audrey had slammed the door on his arm and shoulder. Carpenter testified that the combination of the yelling and screaming, the incoherent talk, the past events with the tricycle and the use of force in slamming the door on him led to his decision to commit her under the Baker Act. Tr. vol. 6 at 49. Carpenter's decision to commit Audrey has to be based, of course, on his judgment that she satisfied the criteria for involuntary examination at the time of commitment. *See* Fla.Stat.Ann. Sec. 394.-463(1) (1984). His knowledge of Audrey's prior behavior and her prior examination was necessarily part of the overall set of facts calling his attention to her later unusual behavior that posed a threat to herself or others, but it would not serve as an additional ground for his determination that an involuntary examination was required.

There is no substantial evidence to support a conclusion that Carpenter acted in bad faith under *Harlow* when he carried out the provision of the Baker Act that: "A law enforcement officer may take a person who appears to meet the criteria for involuntary examination into custody and deliver him or have him delivered to the nearest receiving facility for examination." Fla. Stat.Ann. § 394.463(2)(a)(2). *See Sebastian v. United States*, 531 F.2d 900, 903 (8th Cir.), *cert. denied*, 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976), (deputies who committed plaintiff in good faith reliance on Arkansas law immune from liability).

This does not foreclose the possibility that Carpenter would not have immunity in

a state action under the particular liability and immunity provisions of the Baker Act.[9]

### III. The judgment against Carpenter for common law battery

■ On appeal the parties brief Count 3 as a § 1983 claim. It is not. It was not submitted to the jury as such, and the harm inflicted on Audrey would be insufficient as a matter of law to rise to the level of a constitutional violation. The LeSavages did not allege any abuse of government power sufficient to raise an ordinary tort to the level of a constitutional violation; *Williams v. Kelley*, 624 F.2d 695 (1980, *cert. denied*, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981), nor did the proof tend to show any such abuse. There was sufficient evidence to support a jury inference that Carpenter, in arresting Audrey, grasped her arm with excessive force and bruised the arm. This is a simple common law battery claim and tried as such. We affirm the judgment against Carpenter in the amount of $1,500.

### IV. The Count 4 judgment against the Whites for malicious prosecution

■ The malicious prosecution claim had been removed from the case before trial. Because this was the only claim against the Whites, they were entitled to be dismissed from the case.

The parties agreed to an initial pretrial stipulation in March 1982. In July the LeSavages proposed a new pretrial stipulation to which the defendants objected. At the second pretrial conference, in July, the magistrate stated that if the parties could not agree on a new stipulation then the original pretrial stipulation would be binding. The LeSavages gave notice that they intended to sue the Whites for malicious prosecution. The Whites objected, asserting that at the earlier pretrial conference they had given up the right to obtain evidence from Michigan, the LeSavages' previous home, a right they would not have given up if they had known that they would be sued for malicious prosecution. After the conference the Whites gave the LeSavages a 28 item memo stating their demands if the LeSavages would not drop the malicious prosecution claim. Included was a threat to counter-sue.

A third pretrial conference was held in August at which the LeSavages agreed to delete from their suggested new pretrial order the phrase "that the Defendants White by their actions, caused the malicious prosecution of the Plaintiff, Bernard LeSavage," and substitute that "[t]he Defendants White knowingly gave false information to Detective Carpenter which was a proximate cause of the arrest of Bernard LeSavage."

At trial, in a bench conference, the trial judge tried to determine what claims were being made. He was furnished with a photocopy of a marked up pretrial stipulation on which some of the deletions could not be read instead of a copy of an amended and clear version. The court ruled that the malicious prosecution claim was properly before the court and the issue was tried over the Whites' objection.

The LeSavages agreed to remove the issue of malicious prosecution, and it should not have been tried. Because of our resolution of this issue we need not reach the posttrial issues regarding enforcement of the LeSavages' judgment against the Whites.

### V. Attorneys fees against the county

Because of our disposition of the LeSavages' § 1983 claim, they are not entitled to fees under 42 U.S.C. § 1988.

### VI. Conclusion

The judgments against Carpenter on Counts 1 and 2 and the judgment against

---

9. Fla.Stat.Ann. § 394.459(13) provides that "[a]ny person who violates or abuses any rights or privileges of patients provided by this act shall be liable for damages as determined by law." Fla.Stat.Ann. § 394.459(13) also provides that

Any person who acts in good faith in compliance with the provisions of this part shall be immune from civil or criminal liability for his actions in connection with the admission, diagnosis, treatment, or discharge of a patient to or from such a facility. However, this section shall not relieve any person from liability if such person is guilty of negligence.

the Whites on Count 4 are REVERSED and the case is REMANDED for entry of judgments on these counts for the respective defendants. The judgment against Carpenter on Count 3 is AFFIRMED.