**James THOMPSON, Sr., and Jimmy Thompson, Jr., Plaintiffs,**

v.

**Ronnie SPIKES, Doug Lanier, Tommy Maulden, Robert Paul Johnson and Van Findley, Defendants.**

No. CV486–316.

United States District Court,
S.D. Georgia,
Savannah Division.

June 22, 1987.

Robert S. Reeves, Swainsboro, Ga., for plaintiffs.

Alex Zipperer, Savannah, Ga., William F. Amideo, Asst. Atty. Gen., Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

Plaintiff James Thompson, Sr. (Thompson, Sr.) has brought suit in this Court, claiming to have suffered injury at the hands of the above-named defendant law enforcement officers.[1] Plaintiff seeks damages both pursuant to the provisions of 42 U.S.C. § 1983, essentially for alleged violations of his fourth amendment rights, and under a state law theory of negligence. Before the Court are the defendants' motions for summary judgment.

---

1. Suit was initially brought on behalf of both James Thompson, Sr. *and* James Thompson, Jr., plaintiff s son. The latter was named as a plaintiff without his consent (Thompson, Jr. Deposition of 2/3/87 at 5), and an agreement has been reached between the parties for the release of James Thompson, Jr. from this action. Four defendants not referenced in the caption have been dismissed on motion by plaintiff.

## I. BACKGROUND

On Saturday, September 8, 1984, a young black man named Joe Boy Roberson entered Thompson's Store, an establishment situated at the corner of Second Street and Route 17 in the City of Guyton, Effingham County, Georgia. Roberson asked one of the store's cashiers whether he might purchase beer on credit. When this request was refused, Roberson became loud and argumentative.[2] Consequently, James Thompson, Jr. (Thompson, Jr.), who is the white owner of the store and the son of the plaintiff, approached from the rear of the store, had words with Roberson, and ultimately grabbed the latter by the belt or collar, or both, and "escorted" him out the front door. (Donaldson Deposition at 16–17; Neidlinger Deposition at 11).

Notwithstanding that Roberson had been dropped off by friends in front of the grocery store several minutes before this incident, and despite the fact that Roberson was escorted out the same door through which he had entered, for some reason he and his friends did not cross paths. Thompson, Jr. believes that Roberson went home to sleep. According to counsel for one of the defendants, Roberson decided to leave the area with other friends. At any rate, soon after Roberson's departure, the friends with whom Roberson had arrived entered the store and asked Thompson, Jr. where "Joe Boy" was. Thompson responded that he did not know, and Roberson's friends departed. (Thompson, Jr. Deposition of 4/2/87 at 11–13).

Without going into detail (the details would be as difficult to ascertain as they would be irrelevant), it appears that certain members of the community developed a suspicion that Joe Boy Roberson was being held hostage in Thompson's Store. At 9:00 P.M., as Thompson, Jr. and several employees were "locking up" for the night, several unarmed black men approached the front of the store demanding to know where Joe Boy Roberson was, and insisting that they be allowed to enter in order to look for Roberson. Thompson, Jr. stated that he did not know Roberson's whereabouts, refused to unlock the door or to allow the individuals to enter, and directed his employees, and several of their friends who had not left prior to closing, to go immediately to the back of the store where they would be safe from harm. The men pounded on the windows of the store and voiced their displeasure in no uncertain terms. Thompson, Jr. located a shotgun and with it approached the front of the store. The men outside departed.

Within a very short time, a crowd of several hundred black persons gathered in a parking lot located on the opposite side of Route 17 from Thompson's Store. Some members of the crowd were armed, and shots were fired from the parking lot in the direction of the store. Intermittent shooting continued for well over forty-five minutes, throughout the course of events described below. (Thompson, Jr. Deposition of 4/2/87 at 16–21, 30–32; Donaldson Deposition at 19–21, 23; Neidlinger Deposition at 15–16; Lanier Deposition at 11, 21).

Thompson, Jr. deemed it best not to allow any of the store's occupants to depart. He directed one of his employees to call Thompson, Sr., who was then in a nearby home. An employee, Loretta Donaldson, also called the Effingham County Sheriff's Department.

If the crowd's misunderstanding with respect to Roberson's purported presence in Thompson's store seems difficult to fathom, even greater depths of confusion were reached later on the evening in question. The Court believes that much confusion may have been caused by employee Donaldson's telephone conversation with the Sheriff Department's dispatcher. Apparently, the dispatcher had received informa-

---

**2.** A great many depositions were filed by the parties as exhibits to the pending summary judgment motions. A reading of these documents bears witness to the fact that memory is a strange creature: the divergence in the deponents' descriptions of facts and surroundings is indeed "interesting," as one attorney has put it. In any event, the discrepancies in testimony for the most part do not relate to matters material to the disposition of the issues at hand. The Court here attempts to piece together a reasonable account of the evening's events, noting discrepancies only where relevant.

tion, just prior to taking Ms. Donaldson's call, to the effect that there was a man with a gun in Thompson's store; this intelligence concerning "a man with a gun" had been relayed by the dispatcher to the Sheriff, who at the time was searching for an escaped convict in Springfield, Georgia, some five miles from Guyton. (Lanier Deposition at 7). Whether the dispatcher received other calls from persons in Guyton, and whether the persons making them claimed that a hostage situation was occurring inside the store, is not clear, though it is quite likely that such was the case. In any event, it appears either that Ms. Donaldson inadvertently led the dispatcher to believe that Ms. Donaldson and others were being held hostage *by persons inside the store* or that Ms. Donaldson's recitation of the facts was not adequate to dispel the impression that earlier or roughly contemporaneous phone calls were leaving on the dispatcher. A portion of Ms. Donaldson's deposition testimony is set out in the margin.[3] Thus, notwithstanding that contact had been made with the Sheriff's Department by one of the occupants of the store, the dispatcher communicated to Deputy Sheriff Douglas Lanier (who at this point was already en route to Guyton from Springfield under instructions from the sheriff) that six armed white males were holding Joe Boy Roberson hostage in Thompson's Store. (Lanier Deposition at 7).

More crossed signals were yet to come. Just before Ms. Donaldson placed her call, and about ten minutes after the black men had first tried to gain entrance to the store, another Thompson's employee, Ms. Neidlinger, had determined that she could safely leave the Thompson establishment and seek help from the sheriff. Ms. Neidlinger exited through the front door unharmed, got into her car, and drove the five miles to Springfield. She passed at least one police vehicle, which was heading in the opposite direction. In Springfield, Ms. Neidlinger spoke face to face with the dispatcher. Ms. Neidlinger neither told the dispatcher that she had been inside Thompson's Store nor explained the facts of the situation in Guyton in detail; she did, however, convey that they "needed help at Thompson's Store, there was a disturbance." To this the dispatcher is said to have responded: "That's alright. Lady, I know it. They done called." According to Ms. Neidlinger, the dispatcher was filing her nails as Ms. Neidlinger made her report, and "acted like she could care less." (Neidlinger Deposition at 29–31). Ms. Neidlinger then returned to Guyton, where she drove past Thompson's Store and spoke briefly with Deputy Lanier; the latter told Ms. Neidlinger not to get out of her car because there was "some trouble." Ms. Neidlinger dutifully obeyed, went home to bed, and heard nothing of the events that occurred somewhat later that evening until the next morning.

Backtracking for a moment, it should be pointed out that Thompson, Sr. had responded to the telephone call placed to him some minutes earlier from his son's gro-

---

**3.** Q. Now, you said before, in regard to your conversation with the Sheriff's Office on the telephone, that you know you told the lady who you were—
A. Uh-huh.
Q. —that you were at Thompson's—
A. Uh-huh.
Q. —and that there were a lot of blacks outside—
A. Uh-huh.
Q. —with shotguns and you'all couldn't leave?
A. Right.
Q. Alright [sic], you then said that it seems like the lady asked you if you were hostages.
A. Yes, sir.
Q. Do you remember for sure whether she said that?

A. I believe she did.
Q. So, you'd be comfortable testifying under oath ... that, whoever talked to you on the other end of the telephone, in fact asked you whether you were a hostage?
A. (Indicating affirmatively).
Q. And you said yes.
A. I guess, I just told her there were a lot of black people with guns. To me, we were, we couldn't leave.
Q. I understand that, alright. But you didn't tell her the blacks were holding you hostage, she asked you if you were a hostage, and you told her yes. Is that how the sequence went?
A. I believe it was.
Donaldson Deposition at 56–57. *Cf. id.* at 70.

cery store. Upon receiving the call, Thompson, Sr. armed himself with a shotgun, and drove off in his pick-up truck to Thompson's Store. Stopping his truck by the front door of the store, Thompson, Sr. surveyed the crowd across the street, heard shots being fired, and at first declined his son's invitation to hurry into the building. After several minutes, however, Thompson, Sr. did exit the truck and enter the store. Within a minute thereafter, a bullet went through the window of Thompson, Sr.'s pick-up truck. (Thompson, Sr. Deposition of 1/20/87 at 10–15; Thompson, Jr. Deposition of 4/2/87 at 31). The two Thompsons began to discuss how to remove the occupants of the store to safety.

At about 9:40, and probably within a very few minutes after Thompson, Sr. entered the building, two deputy sheriff's vehicles, the first to arrive on the scene, approached Thompson's Store from opposite directions. One vehicle was driven by Deputy Lanier, the above-mentioned officer with whom Ms. Neidlinger spoke upon her return from Springfield. The other vehicle was occupied by Deputy William T. Maulden and Constable Robert "Rock" Johnson. The constable had been specially deputized to "sit on marijuana patches," but was not a peace officer, and had not received law enforcement training. The two officers and the constable took stock of the situation, Deputy Lanier positioning his vehicle at the corner of Route 17 and Second Street in such a way as to place his back to the brick wall of the store and the vehicle between himself and the crowd on the opposite side of Route 17. According to Deputy Lanier, the officers feared both the crowd and the occupants of the store, and "the wall ... would give us cover from the inside of the store and the car would give us cover from the parking lot." Deputy Maulden and Constable Johnson parked at the other end of Thompson's Store, on Second Street, a short distance east of Deputy Lanier's vehicle. Having exited their vehicle, the two men walked quickly westward, past the doorway of the store, and joined Deputy Lanier at the corner of Second Street and Route 17. (Lanier Deposi-

tion at 9–10; Maulden Deposition at 8–10; Johnson Deposition at 14).

While the officers stood or crouched by Lanier's vehicle, a black man named Rowland Jackson approached them. Jackson told Deputy Lanier "what he knew about the situation" (*i.e.*, that a black man was being held hostage in Thompson's Store), and then departed. Jackson was known to Deputy Lanier to be "a good fellow," and he did not appear to be drunk. Thus, the deputy credited the intelligence provided to him. Lanier, while in the midst of his conversation with Rowland, had directed Johnson to call for back-up, which task was performed. After Jackson departed, Lanier and Maulden walked eastward to Maulden's vehicle, again moving quickly past the entrance of Thompson's Store. According to Deputy Lanier, the situation with which he believed himself to be confronted could not be handled by three officers; back-up law enforcement personnel were absolutely essential. Lanier therefore elected not to set up a "command post," or to attempt telephone communication with the occupants of the store until after the arrival of reinforcements. (Lanier Deposition at 15–17, 35–36; Maulden Deposition at 11, 13–14; Johnson Deposition at 13–16). It does not appear that Constable Johnson, who had been directed to send for additional officers, was instructed to attempt telephone communication with the persons in Thompson's Store.

Returning briefly to Springfield, Georgia ... Sheriff Van Findley was still involved in searching for an escaped convict when word reached him that additional manpower had been requested. State Troopers Ronnie Spikes and J.K. Horn were assisting the sheriff in his search for the errant inmate. Findley did not feel at liberty to leave Springfield, having just heard, at the time the request for back-up was relayed to him, several gunshots that he presumably suspected to have been shot by or at the escaped convict. Therefore, he requested that Spikes and Horn go to Guyton to "back up" his officers. Findley indicated to the Troopers that he "would be over shortly to ... help them if they needed

help." (Spikes Deposition at 5; Findley Deposition at 7).

Spikes and Horn arrived in Guyton, to the relief of the waiting officers. Horn left the vehicle to direct traffic. Spikes drove on and pulled up next to Maulden's police car, where Lanier briefed him on the situation. Lanier related that there was a "possible hostage situation" in the store and that an angry crowd was nearby. (Lanier Deposition at 31, 42). Spikes saw Constable Johnson across the street, apparently in need of "cover." At Lanier's suggestion, Spikes backed his car across the street, stopping close to Johnson and almost directly across the street from the entrance to Thompson's Store. At this time, the large crowd remained on the opposite side of Route 17, firing occasional .22 caliber rounds, and shouting incessantly. The officers believed, apparently with justification, that the crowd continued to suspect that Joe Boy Roberson was being held hostage inside the store. (Lanier Deposition at 31, 43–44; Spikes Deposition at 9–11).

The Thompsons too were relieved by the arrival of the troopers, for the additional officers' presence assured them that it was, finally, safe enough to risk allowing the employees and visitors still in the store to depart. Johnson, Jr., shotgun in hand but at his side, ushered all the employees and visitors to the front of the store, and unlocked and opened the front door. All of the store's occupants, except for the two Thompson men, then exited through the front door and headed eastward, past Maulden and Lanier, and toward a house located a short distance down Second Street. The officers on the street are alleged to have levelled their weapons at the departing employees, prompting Thompson, Jr., according to one witness, to exclaim: "For God's sake, get your weapons down." The Thompsons stayed behind in order to protect their property from the crowd. When the employees and others had left, Thompson, Jr. joined his father in the back of the store. (Thompson, Jr. Deposition of 4/2/87 at 38, 40; Thompson, Sr. Deposition of 4/2/87 at 26–27; Jay Thompson Deposition

at 24–25). The time was approximately 10:00 P.M.

Hotly disputed are the facts surrounding the following several minutes. According to Trooper Spikes, he was just exiting his vehicle when he saw several persons running eastward down Second Street from the area of the store. Spikes claims that he did not know where these people had come from, but that Deputy Lanier radioed, informing Spikes that "[t]he hostages have been released. There's two armed subjects in the store still with shotguns...." Trooper Spikes claims, though not all witnesses corroborate his claim, that he then announced over his vehicle's public address system that he was from the Georgia State Patrol and that the occupants of the store should come out unarmed and with their hands in the air, or something to that effect. Both Thompsons have sworn that they heard no such announcement.

Within a minute or so after the alleged public address announcement, the Thompsons moved to the front of the store, each with shotgun in hand, in order to find out what was transpiring outside. At this time, Constable Johnson and Trooper Spikes were still standing behind Spikes's vehicle.

Noticing that Thompson, Sr. could be seen behind the glass of the front door, Constable Johnson yelled: "There he is," and promptly ducked down behind the police vehicle. At the same time, Thompson, Sr. turned to speak to his son. Trooper Spikes, having turned to look at the front door because of Johnson's exclamation, noticed the movement of Thompson, Sr.'s gun. Probably the most hotly contested issue of fact in the instant case is whether Thompson, Sr.'s gun reasonably could be viewed, when Thompson, Sr. turned, as having been pointed at the officers outside. Thompson, Sr. claims that his gun was held in his left hand only, at his side, and facing the ground; Thompson, Jr. concurs that the gun was aimed toward the ground. Constable Johnson claims that when last he looked, before he ducked behind the police car, Thompson, Sr. was holding his gun at his side. Trooper Spikes claims that he

saw Thompson, Sr. raising his shotgun with both hands and pointing it at Spikes. In any event, Trooper Spikes fired a blast toward the front door of the store, and simultaneously or immediately thereafter dived behind his vehicle. Fortunately, only a single pellet passed through the glass of the store's front door. Unfortunately, this pellet lodged in Thompson, Sr.'s forehead, and flying glass struck Thompson, Jr. in the face. (Lanier Deposition at 32–34; Johnson Deposition at 33–34; Spikes Deposition at 12–13, 16–18; Jay Thompson Deposition at 20–25; Thompson, Jr. Deposition of 4/2/87 at 41; Thompson, Sr. Deposition of 4/2/87 at 25, 34).

Deposition testimony indicates that those occupants of the store who had exited just prior to the shooting had been somewhat surprised that the police had had their guns aimed at the store when the occupants exited; not one of them, until some time after plaintiff was shot, was aware that the police believed Roberson was being held hostage inside. Also according to the departing occupants, when Spikes's shot was fired, they were approaching the nearby house on Second Street. These witnesses claim that no officer had attempted to speak with them about the situation inside the store and that, rather, the officers had allowed them to pass by without comment. Deputy Lanier, on the other hand, claims that he had just gestured to two of the "hostages" to come over to speak with him when Trooper Spikes fired on Thompson's Store. (Lanier Deposition at 21–22; Jay Thompson Deposition at 20–25; Donaldson Deposition at 49, 66).

Sheriff Findley, in the meantime, had concluded his business in Springfield, and was on his way to Guyton when he received the news that a shot had been fired. Arriving at the scene shortly thereafter, Sheriff Findley spoke to persons at various positions around the store, and then joined Lanier and Maulden at the east end of Thompson's Store. Findley either "gave permission" to Deputy Lanier, or directed the latter, to go inside the house to which the store employees had run, in order to "set up a command post," and to contact the remaining occupants of the store. La-

nier entered the nearby home, dialed Thompson's Store, and spoke with Thompson, Jr.

Lanier first told Thompson, Jr. that the officers expected the Thompsons to come out with their hands up. Thompson, Jr. expressed his surprise, and asked: "Why man?" and "Who is shooting at us?" Thompson, Jr. also made it clear that the Thompsons were still afraid of being shot at by the crowd. Lanier indicated that he would "help them get out of there." This telephone conversation probably took place some five to ten minutes after the shooting of Thompson, Sr. by Trooper Spikes. A police vehicle was then positioned in front of Thompson's Store, and several minutes later the Thompsons voluntarily emerged and were taken to the hospital for treatment. (Lanier Deposition at 25, 29–30; Donaldson Deposition at 64–65; Thompson, Jr. Deposition at 48–49; Findley Deposition at 8–10, 16–17).

## II. LAW AND ANALYSIS

Plaintiff Thompson, Sr. has brought suit against the defendants under various federal and state law theories. All defendants are alleged to have violated the following federal constitutional rights of the plaintiff: "the right to be secure in one's person; the right to be free from unlawful seizure of one's person; the freedom of movement; the right to be free of arbitrary and unreasonable interference by law enforcement officers; and the right to be free from unlawful detention." These rights, according to plaintiff, have "been held by cases too numerous to include [in plaintiff's briefs] to be protected by the United States Constitution." All defendants are also alleged to have acted negligently, and are sued for negligence under state law. As to the capacities in which the defendants are sued, Sheriff Findley and defendant Spikes are named as defendants in their individual and official capacities; the remaining defendants, it appears, are sued only in their individual capacities.

Defendant Spikes has filed a motion for summary judgment; a separate motion for

summary judgment has been filed on behalf of the county defendants. That portion of defendant Spikes's motion for summary judgment relating to claims against him in his official capacity has not been opposed; therefore, these claims shall not be addressed further.

The Court will first take up the remaining portions of Trooper Spikes's motion for summary judgment. For reasons to be stated, this defendant is not entitled to judgment as a matter of law with respect to either the federal or state law claims brought against him in his individual capacity, for there remain factual disputes with respect to Trooper Spikes's conduct that are best left for resolution at trial. The Court will then analyze briefly the remaining defendants' motion for summary judgment. A brief analysis of that motion is all that is required, for it is clear that the county defendants violated none of plaintiff's federal constitutional rights. Accordingly, and for reasons also to be stated, the Court will decline to exercise jurisdiction over the pendent state claims brought against defendants Findley, Johnson, Maulden and Lanier.

### A. *Trooper Spikes*

#### 1. Federal Law Issues

#### a. *Substantive Claims*

In this jurisdiction, allegations of use of excessive force, or improper use of deadly force, on the part of law enforcement personnel must be analyzed in light of the opinion of the en banc Eleventh Circuit Court of Appeals in *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir.1985). In *Gilmere*, plaintiff's decedent had been shot by two Atlanta police officers. The Court of Appeals determined that neither *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (§ 1983 cause of action will not lie for negligent deprivation of a property interest without procedural due process where adequate state remedy exists), nor *Parratt*'s progeny, which had expanded upon the *Parratt* rationale, barred the bringing of an action by plaintiff under § 1983 against the defendant police officers. Further, the *Gilmere*

Court determined that plaintiff could predicate a § 1983 claim on "at least two alternative constitutional theories." 774 F.2d at 1499. Substantive due process violations, and violations of an individual's fourth amendment rights, the Court held, remained actionable under § 1983 notwithstanding the *Parratt* decision. *Id.*

The substantive due process analysis outlined in *Gilmere* is suitable for application in many cases involving the use of excessive force of one kind or another by police officers, as is the fourth amendment analysis also approved by the *Gilmere* Court. The facts of any given case will determine whether a plaintiff chooses to allege a deprivation of substantive due process rights, fourth amendment rights, or both. However, in order to establish a substantive due process violation, a somewhat heavier burden is placed on a plaintiff than is the case with respect to making out a violation of fourth amendment rights.

■ The balancing test for determining whether a substantive due process violation has been committed, while similar in many respects to that for assessing a fourth amendment claim, requires a plaintiff to show that the force used by a defendant officer was applied "maliciously and sadistically for the very purpose of causing harm." *Gilmere*, 774 F.2d at 1501. The fourth amendment balancing test, on the other hand, does not include a "malicious and sadistic" element; rather, the reasonableness of the seizure or intrusion is the central inquiry, as is the case with respect to fourth amendment analyses outside of the police abuse context.

Citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the *Gilmere* Court determined that the shooting of an individual was clearly a seizure, and that plaintiff's claim, that the shooting of her brother by a police officer had constituted an *unreasonable* seizure, should be analyzed by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Gilmere*,

774 F.2d at 1502 (quotations and citations omitted). The Court continued by noting that "[i]n conducting this balancing test, [courts] are to consider 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Id.*, quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Thus, the fourth amendment theory of recovery recognized by the *Gilmere* Court imposes a significantly lower burden of proof on a plaintiff than does the substantive due process theory. *See Patterson v. Fuller*, 654 F.Supp. 418, 425–28 (N.D.Ga.1987) (officer may be held liable for negligence where plaintiff seeks recovery on fourth amendment theory).

Because plaintiff has not identified the case law on which he relies, and because it would appear that the facts of the case at bar would not necessitate recourse to a substantive due process analysis, the Court assumes that plaintiff has chosen to proceed on a fourth amendment theory, in accordance with the rules outlined in *Gilmere*. Counsel for defendant Spikes has apparently reached the same conclusion as to the nature of plaintiff's claim, and has argued accordingly.

b. *Qualified Immunity*

Defendant Spikes claims that he is protected from liability by "qualified immunity." Under certain circumstances, a "defense" of qualified immunity is available to government officials. The contours of qualified immunity were outlined in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), in which case the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The *Harlow* court pointed out certain policy considerations supporting a qualified immunity for officials performing discretionary functions, noting that the immunity would "avoid excessive disruption of government and permit the resolu-

tion of many insubstantial claims on summary judgment." *Id.* The court in *Harlow* made it clear that "if the law [the violation of which caused injury to a plaintiff] was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–819, 102 S.Ct. at 2738. The court acknowledged that if "extraordinary circumstances" were shown in a given case, and if an official claiming such circumstances could show that he "neither knew or should have known of the relevant legal standard," qualified immunity would bar suit against the official. However, the court noted that an objective test would apply in determining whether the official "knew or should have known" of the existing legal standard.

■ The nature of qualified immunity was elaborated upon in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In that case, the court determined that a district court denial of qualified immunity is an appealable "final order." In reaching its decision, the court emphasized that a government officer's entitlement to qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and ... it is effectively lost if a case is erroneously permitted to go to trial." *Id.* 472 U.S. at 526, 105 S.Ct. at 2816, 86 L.Ed.2d at 425. Bearing in mind the Supreme Court's observation, and taking into account that a "defense" not raised is waived, it is clear that a government official's entitlement to such immunity should be asserted by the official by motion for summary judgment, and that the district court must rule on the motion prior to trial. *Helton v. Clements*, 787 F.2d 1016 (5th Cir.1986); *Llaguno v. Mincey*, 763 F.2d 1560, 1569 (1985).

■ There remains a question, however, whether, after a district court has denied a defendant's motion for summary judgment on qualified immunity grounds, the qualified immunity "defense" should be submitted to the jury or, for that matter, whether the issue is ever properly before

the jury. It appears in this regard that the *Mitchell* decision represents both a refinement of *Harlow* and a directive to the courts with respect to the way in which the qualified immunity issue should be handled. As the *Mitchell* court noted, "a claim of immunity is conceptually distinct from the merits of plaintiff's claim that his rights have been violated." *Mitchell*, 472 U.S. at 527–28, 105 S.Ct. at 2816, 86 L.Ed.2d at 426. The court also made certain observations, in connection with the conclusive nature of a district court's denial of a motion for summary judgment on qualified immunity grounds, that can be read as indicative of the court's belief that qualified immunity is a matter to be considered exclusively by the court as a matter of law, and never by the trier of fact:

> In some cases, [such a denial of summary judgment] may represent the trial court's conclusion that even if the facts are as asserted by the defendant, the defendant's actions violated clearly established law and are therefore not within the scope of the qualified immunity. In such a case, there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune. Alternatively, the trial judge may rule only that if the facts are as asserted by the plaintiff, the defendant is not immune. At trial, the plaintiff may not succeed in proving his version of the facts, and the defendant may thus escape liability.

The Supreme Court thus appears to have implied that a federal court faced with a motion for summary judgment on qualified immunity grounds may either: 1) grant the motion because the right alleged to have been violated was not clearly established or because the officer in objective good faith did not know of a clearly established right; 2) deny the motion because defendant's acts violated clearly established rights of which a reasonably competent public official would have known; or 3) deny the motion because the rights were clearly established, but the violation thereof has not yet been conclusively disproved. If the court exercises the third option, the qualified immunity defense will not be relitigated at trial, instructions on qualified immunity will not be given to the jury, and the "factfinder's role [will be] limited to determining whether the underlying facts are as the plaintiff has alleged or proved." *McIntosh v. Weinberger*, 810 F.2d 1411, 1431 n. 8 (8th Cir.1987).[4] Thus, a district court must carefully examine a defendant's claim of qualified immunity, for if the claim of entitlement is denied, the defendant will stand trial on the merits of plaintiff's claim.

■ Turning to the case at hand, the Court must, in order to determine whether defendant Spikes is entitled to qualified immunity, decide whether the facts as plaintiff has alleged them make out a violation of clearly established law. It is without doubt that plaintiff had a clearly established constitutional right to be free from unreasonable seizures. Plaintiff also had a clearly established constitutional right not to be seized by means of deadly force unless the officer had "probable cause to believe that [plaintiff posed] a threat of serious physical harm, either to the [de-

---

**4.** While there is pre-*Mitchell* authority in this Circuit that appears to support the proposition that the issue of qualified immunity is appropriate for jury resolution, *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir.1985), it is open to question whether that holding is consistent with *Mitchell*'s teachings that qualified immunity is an immunity from suit that is lost where a case is allowed to proceed to trial, and that entitlement to qualified immunity turns on "the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2816, 86 L.Ed.2d at 425. On the other hand, where, for example, a court makes the legal

determination that the rights allegedly violated were not clearly established, but there remains a "factual" question whether the official was acting within the scope of his discretionary authority and is therefore entitled to the protection of the immunity, this latter question might be sent to the jury. *Wilson, supra,* 757 F.2d at 1247. Still, if this issue were submitted to the jury not in isolation, but rather along with other elements of the qualified immunity issue, such an approach would be inconsistent with *Mitchell*'s general directive that the immunity is one from suit, and further would create undue confusion. *See infra* note 5.

fendant] or to others...." *Garner, supra.* Notwithstanding that *Garner* was decided in 1985, its holding was clearly foreshadowed by previous cases, *see generally Acoff v. Abston,* 762 F.2d 1543, 1548–50 (11th Cir.1985). Moreover, *Garner* represented a break from the past only with respect to the rules concerning fleeing felons. As the Eleventh Circuit held in a recent case: "shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was— even in July, 1983—an unreasonable seizure and clearly violated fourth amendment law." *Lundgren v. McDaniel,* 814 F.2d 600, 603, (11th Cir.1987). Plaintiff's rights were clearly established, and the facts as alleged by plaintiff could justify a jury in determining that defendant Spikes did not have probable cause to use deadly force, or that Spikes's seizure of the plaintiff was otherwise unreasonable under the balancing test outlined in *Gilmere.* Accordingly, defendant Spikes is not entitled to qualified immunity.

■ It is true that the Court would be at liberty to grant defendant Spikes's motion for summary judgment if the facts at issue clearly established the absence of any genuine issue of material fact with respect to the objective *reasonableness* of defendant Spikes's seizure, notwithstanding the existence of a clearly established constitutional right. Such a ruling, on the one hand, would be more in the nature of a judgment *on the merits, see Scheuer v. Rhodes,* 416 U.S. 232, 245–46, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 13 L.Ed.2d 288 (1967); *see also infra* note 28, than it would be a true determination of entitlement to qualified immunity of the type outlined in *Harlow* and *Mitchell, but cf. LeSavage v. White,* 755 F.2d 814, 821–22 (11th Cir.1985),

and, on the other hand, is not warranted in the case *sub judice.*

■ Defendant Spikes has raised a number of contentions with respect to the reasonableness of his actions, emphasizing that he had been alerted to a potential hostage situation by other officers at the scene of the "Guyton incident," and that various acts or omissions on the part of plaintiff and others gave rise to probable cause to believe that plaintiff posed a threat to Spikes's life. The Court does not doubt that the situation in Guyton on the evening of September 8, 1984 was tense indeed, and it may well be that a jury ultimately will determine that defendant Spikes's acts were justified. However, there remain substantial factual questions, not appropriate for resolution by this Court, with respect to the reasonableness of Spikes's conduct. For example, a jury must decide the credit to be given to Spikes's testimony that he communicated to the store's occupants over his vehicle's public address system. Also for the jury's consideration will be the questions, *inter alia,* whether Spikes's conduct was unreasonable from the perspective of placing bystanders or innocent persons in danger, whether it would have been feasible and more reasonable for Spikes to duck behind his police vehicle, as did Constable Johnson, as an alternative to shooting at the plaintiff, and whether it was *objectively* reasonable for Spikes to assume, judging from the testimony to be adduced at trial, that his life was in imminent danger. In any event, the facts here, as stated, do not so clearly favor defendant Spikes that he should be entitled to judgment as a matter of law. Accordingly, his motion for summary judgment with respect to plaintiff's fourth amendment claim, brought pursuant to 42 U.S.C. § 1983, is denied.[5]

---

5. Neither the Court's denial of the qualified immunity "defense," nor its determination that the jury shall not be charged on qualified immunity, works an undue hardship on defendant Spikes. At trial, the crucial issue for jury determination will still be whether defendant Spikes's acts were "objectively reasonable," for objective reasonableness is at the heart of the probable cause inquiry. Indeed, that this is the case points out the redundancy and the confu-

sion of immunity and substantive issues that would result from the erroneous submission of "good faith immunity/objective good faith-type" charges in the case at bar. Similar confusion would clearly result from the submission of like charges in cases where *subjective* intent is relevant to the substantive constitutional claim. *See* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126,

**640**

### 2. State Law Issues

#### a. *Substantive Claims*

Plaintiff contends, *inter alia,* that he is entitled to recover damages under Georgia law, with respect to Trooper Spikes's alleged negligence or assaultive conduct in shooting the plaintiff. In response, defendant Spikes argues that his conduct was in all respects reasonable; furthermore, this defendant claims, "[e]ven if it were determined that the firing of his shot was premature, at most it would arise to the level of negligence for which the defendant is entitled to immunity under state law." As will be explained, defendant's argument, that he is entitled to immunity under Georgia law with respect to acts of negligence, is without merit.[6]

#### b. *"Official Immunity"*

■ The State of Georgia recognizes that certain government officers may be entitled to immunity with respect to actions brought in connection with the performance of official acts. The nature of this immunity is different from the federal "qualified immunity" discussed above. First, Georgia law, unlike federal law, does not grant complete *immunity from suit* upon a proper invocation of the immunity; rather, the Georgia immunity defense is just that—a defense, which offers protection from liability to an official where the

official is shown to have been performing a "discretionary," as opposed to a "ministerial," function, and where the official's acts were not undertaken in subjective bad faith. If at trial it can be established that the official acted "wilfully, maliciously, or corruptly," the official may be held liable, notwithstanding that his act may have been within the scope of his discretionary authority. Second, Georgia immunity is different from federal qualified immunity in that state statutory and case law indicates clearly that the official immunity defense under Georgia law is not available to law enforcement personnel.

To understand the present state of the law in Georgia, it is necessary to trace the evolution of case law and statutory provisions with respect to "civilian" government employees on the one hand, and law enforcement officers, on the other hand. Early Georgia cases foreshadowed the subsequent treatment to be afforded to both types of public servants. The Court turns first to the liability of law enforcement officers under Georgia law.

In *Cook v. City of Macon,* 54 Ga. 468, 469 (1875), the Georgia Supreme Court determined that, while a municipality should not be liable for the torts of its police officers, the officer himself should be held liable for torts committed by him.[7] That case represents merely one example from a nearly unbroken chain of cases extending

141–43 (1985) (discussing problems associated with submission to jury of "good faith immunity/objective good faith-type" charges in situations where subjective intent is an element of the underlying substantive constitutional claim). *See also Martin v. D.C. Metropolitan Police Department,* 812 F.2d 1425 (D.C.Cir.1987); *Wade v. Hegner,* 804 F.2d 67 (7th Cir.1986). In the instant case, while *objective* reasonableness is central to the substantive issues, it would nevertheless be error to confuse the objective reasonableness of the officer's seizure (the substantive issue as to which sufficient genuine issues of material fact exist that summary judgment is inappropriate) with the question whether a reasonably competent officer would have known of the existence of the clearly established right of persons to be free from unreasonable application of deadly force (a question relevant to the immunity inquiry proper). *See generally, Llanguno v. Mincey, supra,* 763 F.2d at 1569; *McDonald v. Doe,* 650 F.Supp. 858 (S.D.N.Y.1986).

**6.** A full treatment of the state immunity issue with respect to law enforcement officers is appropriate for at least two reasons. First, resolution of the question at this stage may have some effect upon pending settlement negotiations in the instant case. Second, the issue has not, to this Court's knowledge, been analyzed in depth in prior decisions and, inasmuch as pendent claims frequently accompany § 1983 claims such as the instant one, it would seem that clear guidelines for assessment of the immunity of officers to these pendent claims are needed.

**7.** The officer in *Cook* was alleged to have falsely arrested the plaintiff. While the decision might at first glance seem to suggest that an officer might be held liable for an intentional tort, or that the officer in the case was potentially liable because he had acted "wilfully and on his own responsibility," the remainder of this section of the Court's Order indicates that the case should not be read so narrowly.

throughout the past century and one half of Georgia case law, holding that law enforcement officers are liable for their own tortious activity, be it intentional, reckless or negligent.[8]

■ At least with respect to county sheriffs and their deputies, in fact, it was—and still remains—a legal requirement that such officers procure official bonds. This bonding requirement has assured the public access to at least some monetary compensation for harm caused by county law enforcement personnel.[9] A deputy's bond can be sued on in contract in connection with tortious acts committed by the deputy in performing his official duties, and a sheriff's bond similarly can be sued on, in connection either with the torts of the sheriff or with those of his deputies. The twin public policies recognized by the requirement that bonds be obtained are: 1) the county law enforcement officer should be held liable for tortious activity, *even where* connected with his official duties; [10] and 2) he should be required to obtain insurance lest his liability should be rendered meaningless by his poverty.

■ Because of contractual limitations upon the risks undertaken by bonding companies, however, it became established law early on that a *bonding company* can be liable *only where* the sheriff's acts,[11] or those of the deputy for whose acts the sheriff is generally liable,[12] can be considered connected to the official's official activity. Acts deemed not to be official cannot form a basis for imposition of liability on the bonding company.[13] Moreover, because suit on a bond is considered an action *in contractu,* it cannot be joined with a tort action against a bonded official individually,[14] and recovery in a contract action on a bond is limited to the applicable.

**8.** There is one somewhat enigmatic break in the chain. *See Plunkett's School for Boys v. City of Thomasville,* 178 Ga. 625, 173 S.E. 656 (1934) (marshal and city attorney not liable, where allegation was that defendants had committed a trespass in levying a tax execution). As will be explained, this case does not significantly impact on the general rule.

**9.** *See generally* O.C.G.A. § 15–16–5 (sheriff required to procure $25,000 bond); O.C.G.A. § 15–16–23 ($5,000 bond required of deputy).

**10.** O.C.G.A. § 15–13–1 (sheriffs and deputies liable "to all actions and disabilities which they incur in respect of any matter or thing relating to or concerning their respective offices").

**11.** *Meeks v. Douglas,* 108 Ga.App. 424, 133 S.E.2d 768 (1963) (sheriff liable on official bond for search conducted pursuant to warrant not supported by probable cause); *Walker v. Whittle,* 83 Ga.App. 445, 64 S.E.2d 87 (1951) (bonding company liable where sheriff engaged in unlawful entry of home and illegal arrest).

**12.** *Chadwick v. Stewart,* 94 Ga.App. 329, 94 S.E.2d 502 (1956) ("A deputy sheriff transporting a prisoner in his custody from one place to the other owes the prisoner the duty to exercise ordinary care while driving the vehicle in which the prisoner is required to ride"; sheriff would be held liable on his bond for negligent acts of deputy); *Hawkins v. National Surety Corporation,* 63 Ga.App. 367, 11 S.E.2d 250 (1940) (bonding company could be held liable where plaintiff's decedent was allegedly falsely arrested, shot, and killed by deputies who, while ex-ceeding authority, were acting within scope of employment); *Powell v. Fidelity and Deposit Co. of Maryland,* 45 Ga.App. 88, 163 S.E. 239 (1932) (bonding company liable where sheriff's deputy assaults and kills prisoner with whom deputy has been entrusted).

**13.** *Culpepper v. United States Fidelity & Guaranty Co.,* 199 Ga. 56, 33 S.E.2d 168 (1945) (sheriff's deputy not liable under official bond for negligently killing pedestrian when injury to pedestrian caused by deputy's violation of traffic regulations while driving to serve jury summons; deputy had no official business with pedestrian); *Wells v. Fidelity & Deposit Co. of Maryland,* 168 Ga.App. 77, 308 S.E.2d 713 (1983) (where sheriff stopped to kill rattlesnake and negligently left automobile jutting into road, officer not performing official duties and therefore bonding company not liable for sheriff's negligence); *New Amsterdam Casualty Co. v. Mathis,* 82 Ga. App. 421, 61 S.E.2d 422 (1950) (bonding company not liable to plaintiff, where county law enforcement officer drove negligently and struck plaintiff in responding to an emergency call); *see generally Johnson v. U.S. Fidelity & Guaranty Co.,* 93 Ga.App. 336, 339–40, 91 S.E.2d 779 (1956).

**14.** *Meeks v. Douglas,* 112 Ga.App. 742, 146 S.E.2d 127 (1965) (petition alleging that county officers wrongfully seized and subsequently damaged property, "although sufficient with respect to all of the defendants individually," could not proceed because *ex delicto* action against individual officers had improperly been joined with action *ex contractu* on bond).

**642**

bond coverage.[15] Thus, there are certain unappealing aspects to suit on a bond. It would appear that the increasingly common procurement of insurance by county governments will render suits on sheriff's bonds relatively rare.[16]

It was at no time a *requirement*, however, that a plaintiff sue on the sheriff's bond. If the plaintiff were fortunate enough to have been injured by a wealthy sheriff or deputy, the plaintiff could sue in tort directly for the full measure of his damages. And, in a direct tort suit there was no requirement that the officer's acts be connected with his official duties for recovery to be had: The officer could be held *individually* liable for torts either connected *or* not connected with his official duties.[17] This has always been the rule in Georgia with respect to all officers, local and state,[18] as well as county,[19] and with

15. *Carlan v. Fidelity & Casualty Co. of New York*, 55 Ga.App. 271, 190 S.E. 47 (1936) (misjoinder apparent where plaintiff asks as damages a sum greater than that provided by sheriff's bond, though potential liability for wrongful acts under color of office acknowledged).

16. *Chatham County Commissioners v. Clark*, 253 Ga. 687, 324 S.E.2d 448 (1985) (county obliged by its own regulation to pay judgment rendered against officer in civil rights action, as a result of officer's use of excessive force); *Chatham County Commissioners v. Rumary*, 253 Ga. 60, 315 S.E.2d 881 (1984) (Chatham County, having voluntarily promulgated regulation calling for defense and indemnification of employees in respect of acts committed during performance of duties, required to pay judgment rendered against sheriff in negligence action arising out of automobile accident involving deputy sheriff's negligence while in performance of official duties).

17. *Jefferson v. Hartley*, 81 Ga. 716 (1889) (bond may be sued upon in contract, as a result of sheriff's wrongful ejection of plaintiff from certain property, prior to or, implicitly, in lieu of institution of tort action against sheriff individually); *Goforth v. Fidelity and Casualty Co. of New York*, 80 Ga.App. 121, 55 S.E.2d 656 (1949) (while action could not proceed because either *ex delicto* action against individual officers had improperly been joined with action *ex contractu* on bond or because plaintiff had impermissibly sued upon both sheriff's and deputy's bonds, leave to amend would be granted in case where deputy was alleged to have unlawfully seized plaintiff's child); *Powell v. Fidelity and Deposit Co. of Maryland*, 48 Ga.App. 529, 173 S.E. 196 (1933) (bonding company may be liable for unprovoked killing by deputy of plaintiff's decedent, though defendant's acts "may [also] give rise to a cause of action ex delicto"); *Cantrell v. National Surety Co.*, 46 Ga.App. 202, 167 S.E. 314 (1932) ("The public officer would himself be liable in tort for any official misconduct or acts colore officii whereby the plaintiff was damaged, and in a recovery the plaintiff would not be restricted to the amount of the officer's official bond.").

18. *Stewart v. Williams*, 243 Ga. 580, 581, 255 S.E.2d 699 (1979) (in defining the tort of false imprisonment, an intentional tort, Georgia Supreme Court stating: "If the confinement is due to the defendant's negligence, the latter may be liable as for negligence, but the action is then governed by the rules and principles of the tort of negligence, according to which the plaintiff is required to show actual damages."); *Harris v. City of Atlanta*, 62 Ga. 290 (1897) (jury issue presented as to whether length of detainee's detention, prior to judicial determination of probable cause, was unreasonable; if unreasonable, officers could be held liable for damages); *McDonald v. Lane*, 80 Ga. 497, 5 S.E. 628 (1886) (police officer individually liable for arrest effected without statutory authority); *Herren v. Abba Cab Co.*, 155 Ga.App. 443, 444, 271 S.E.2d 11 (1980) (officer could be held liable for his negligence in failing to engage his emergency siren); *Dukes v. Hinton*, 136 Ga.App. 227, 220 S.E.2d 713 (1975) (jury question was presented as to level of care exercised by state trooper in high-speed automobile chase); *Wood v. Morris*, 109 Ga.App. 148, 135 S.E.2d 484 (1964) (where police officer, in driving injured child to hospital, was alleged not to have exercised due care, showing of mere negligence would suffice for finding of liability: obligation of ordinary care "aris[es] out of the customary role played by police officers in such emergencies, pursuant to their general responsibility of protecting the lives and welfare of citizens at large."); *Poole v. City of Louisville*, 107 Ga.App. 305, 130 S.E.2d 157 (1963) (officers could be held liable for negligence in engaging in high-speed automobile chase with unmarked police vehicle); *Thomas v. Williams*, 105 Ga.App. 321, 124 S.E.2d 409 (1962) (officer could be held liable for negligence in failing to prevent death of plaintiff's decedent, who died of smoke inhalation in local jail); *see generally Irwin v. Allendale*, 117 Ga.App. 1, 159 S.E.2d 719 (1967) (discussing liability for negligence on the part of jailers).

19. *Pettus v. Smith*, 174 Ga.App. 587, 330 S.E.2d 735 (1985) (where deputy sheriff, in responding to emergency call, was alleged to have negligently driven automobile so as to collide with another vehicle, killing the driver, and where deputy sheriff sued individually, not on bond, and where county insurance would not necessarily cover the deputy, deputy could be held liable to plaintiff's decedent).

regard to both negligent and intentional tortious conduct.[20]

■ A different set of legal rules has been applied in Georgia with respect to the liability of other government officials. These rules had their beginning in an 1881 Georgia Supreme Court decision, *Pruden v. Love*, 67 Ga. 190 (1881). In that case, the plaintiff sued certain city council members, on whose orders plaintiff's building had been demolished. The *Pruden* court held that municipal officials generally may not be held liable for damages arising out of the performance of such officials' police powers unless the officials acted "maliciously, oppressively, corruptly, or without authority of law." [21] The *Pruden* holding with respect to this immunity of municipal officials has been codified, *see* O.C.G.A. § 36–33–4; *see generally* Sentell, *Georgia Local Government Officers: Rights for their Wrongs*, 13 Ga.L.Rev. 747, 755–56 (1979), and the immunity afforded by statute to municipal officers has been extended by judicial decision to state and county government officials.

■ Notwithstanding the general recognition that government officials are entitled to immunity of the type described, the determination whether the immunity is applicable in any given situation is a complicated one, for the law recognizes that an official is entitled to official immunity only where the acts complained of were "discretionary," or were "within the scope of the official's discretionary authority." Where an official acts in a "ministerial" capacity, the immunity is unavailable, and the official may be held liable for mere negligence.

■ The distinction between discretionary and ministerial acts is often nearly impossible to draw. Generally, it appears that lower-level employees are rarely if ever entitled to the immunity, for their jobs entail minimal "discretion." [22] On the other hand, even with respect to upper-level employees occupying positions of a type traditionally viewed as managerial, legislative, or quasi-judicial, the "nature of the act," rather than the title of the official performing it, is the central question in the immunity inquiry; [23] therefore, an official

---

**20.** Of course, officers are entitled to assert certain defenses, and these defenses may have the effect of rendering an officer "immune" from liability if the burden of proof with respect to them has been borne. For example, an officer who can show that his acts were justified by, in certain circumstances, probable cause, or that the acts were, in other cases, reasonable, will be protected from liability. *See* O.C.G.A. § 51–1–11; *Parrott v. Wilson*, 707 F.2d 1262, 1272 (1983); *Kickasola v. Jim Wallace Oil Co.*, 144 Ga.App. 758, 242 S.E.2d 483 (1978); *Stewart v. Williams, supra*, note 18, 243 Ga. 580, 582–83, 255 S.E.2d 699; *see generally Pierson v. Ray*, 386 U.S. 547, 554–56, 87 S.Ct. 1213, 1217–19, 18 L.Ed.2d 288 (1967). Such defenses are far different from the sort of immunity now sought to be invoked by defendant Spikes. Reasonableness of an officer's acts is at the heart of the inquiry with respect to such affirmative defenses, and the plaintiff need not prove that the officer's acts were "wilful, wanton or malicious" before the officer may be held liable.

**21.** In *Pruden*, the court agreed that there was sufficient evidence supportive of the contention that the defendants had acted "without complying substantially with the law" for submission of the issue to the jury, and that therefore the defendants were properly found liable for their acts.

**22.** *Shuman v. Dyess*, 175 Ga.App. 213, 333 S.E.2d 379 (1985) (county public works employ-

ee could be held liable for negligence in transporting, during course of his employment, a government bulldozer; court finds such transportation activity to have been ministerial); *Foster v. Crowder*, 117 Ga.App. 568, 161 S.E.2d 364 (1968) (city employee who, while driving city truck, negligently injured a pedestrian, not entitled to protections of statutory predecessor of O.C.G.A. § 36–33–4).

**23.** *See, e.g., Partain v. Maddox*, 131 Ga.App. 778, 206 S.E.2d 618 (1974) (parole board member entitled to immunity, in absence of showing of wilful, malicious or corrupt action, where he instructed subordinate to change certain locks (thereby denying plaintiff access to files) in order to preserve confidentiality of records; parole board member "acted within his discretionary authority."); *see generally Roberts v. Grigsby*, 177 Ga.App. 377, 339 S.E.2d 633 (1985) (mental health clinic officers, who released patient who subsequently shot plaintiff's decedent, were immune from liability for alleged negligence).

The liability of school officials has in recent years best demonstrated the difficulty encountered by courts in wrestling with the discretionary/ministerial distinction. *See Hennessy v. Webb*, 245 Ga. 329, 264 S.E.2d 878 (1980) (the act or failure to act on the part of a school principal, in allowing a dangerous condition to exist on school grounds, "is not ministerial in

who generally performs discretionary acts may not be entitled to the immunity if the complained-of acts are deemed to be ministerial or if the acts are outside of the defendant's official duties.[24] Of course, a showing that a discretionary act was performed wilfully, wantonly, maliciously, or without legal authority will be sufficient to defeat the immunity.[25]

Perhaps the best treatment of the issue is found in the appropriately named decision of *Miree v. United States*, 490 F.Supp. 768 (N.D.Ga.1980). In *Miree*, Judge O'Kelley discussed the scope of official immunity under Georgia law in some detail, noting, *inter alia*, that "to prevent the specter of tort liability from inhibiting all governmental decisionmaking, the courts have drawn a rather finespun distinction between discretionary and ministerial acts." *Id.* at 772. As to the nature of the distinction itself, Judge O'Kelley stated:

A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

This dichotomy is maintained, for the most part, by stressing the nature of the act involved, the degree of responsibility entrusted to the official, and his position in his employer's hierarchy.

*Id.* at 774.

The immunity just discussed is not available to law enforcement officers. It appears reasonable, first of all, to discern in the statutory and case law a state public policy favoring a comparatively broad liability where tortious activity on the part of a police officer causes damages to a member of the public. Law enforcement officers possess a significant capacity to inflict harm through the misuse of their delegated powers, and Georgia has not seen fit to immunize such officers from liability, absent a showing that the complained of acts were justified, objectively reasonable, etc.[26] Thus, it could be said that *different* rules apply with respect to the acts of police officers from those applicable in connection with the acts of other officials.

On the other hand, even if it is assumed that the acts of all government officials, including those of police officers, are to be analyzed in accordance with the discretionary/ministerial standard outlined above, it remains clear that police officers are not entitled to the immunity. Without

---

nature, but is, rather, discretionary"; thus, principal could not be held liable for negligence), reversing *Webb v. Hennessy*, 150 Ga.App. 326, 257 S.E.2d 315 (1979). The Supreme Court's decision in *Hennessy* has been followed in *Sisson v. Douglas County School District*, 181 Ga. App. 77, 351 S.E.2d 272 (1986), and *Holloway v. Rogers*, 181 Ga.App. 11, 351 S.E.2d 240 (1986).

**24.** Certain acts performed by wardens, for example, have been found ministerial, while others have been deemed discretionary. *See Nelson v. Spaulding County*, 249 Ga. 334, 290 S.E.2d 915 (1982) (warden's responsibility to replace missing stop signs was ministerial, and thus he could be held liable for negligence in failing to replace a stop sign, where the omission resulted in injury to plaintiffs; however, warden's duties with respect to *adopting procedures* for replacement of signs was discretionary, and thus no liability could be imposed on warden for omissions in connection with that duty unless his acts were "wilful, malicious, or corrupt"). *Compare Mathis v. Nelson*, 79 Ga.App. 639, 642, 54 S.E.2d 710 (1949) (where warden had personal knowledge that prisoner was driving truck in

negligent manner, warden could be held liable for negligence in performance of his ministerial duty to carry out "the physical details of [road]work.") *with Price v. Owen*, 67 Ga.App. 58, 60, 19 S.E.2d 529 (1942) (warden's decision to allow prisoners to use truck was discretionary, and thus warden could not be held liable for negligence when drunken prisoners, while driving truck, caused injury to plaintiff).

**25.** *Vickers v. Motte*, 109 Ga.App. 615, 137 S.E.2d 77 (1964) (where allegations were sufficient to show that officials' decision to fill certain land was maliciously intended to cause damage to plaintiff's property liability of officials was not precluded; however, showing of fraud corruption, or abuse of discretion would be required); *McClellan v. Carter*, 30 Ga.App. 150, 117 S.E. 118 (1923) (cattle inspector entitled to immunity; however, because plaintiff alleged that defendant's acts were wanton and were intended to harm plaintiff, complaint would survive general demurrer).

**26.** *See supra* note 20.

# 645

denigrating the functions performed by law enforcement personnel or the crucial nature of the split-second decisions that often must be made by these officers, the Court must note that Georgia courts have deemed police activity to be *ministerial* in nature.[27] Thus, either Georgia applies one rule with respect to the liability of police officers and another rule with respect to the liability of all other officials, or police officers simply are presumed to be at all times performing nondiscretionary functions. In either case, law enforcement officers are not entitled to official immunity.

The Court has found only two cases that might be read as supportive of the proposition that law enforcement officers may on occasion be entitled to such immunity. In *Plunkett's School for Boys v. City of Thomasville,* 178 Ga. 625, 173 S.E. 656 (1934), the plaintiff alleged that the city attorney and a marshal were guilty of a trespass in levying a tax execution. The Supreme Court found both officials to be entitled to immunity. This Court finds the *Thomasville* decision to be both an anomaly (which has been followed by no subsequent decision) and a valuable precedent only insofar as it may suggest that a police officer may avail himself of the defense when he acts so far *outside* of his delegated functions that his acts may fairly be considered discretionary or similar to the acts performed by managerial employees acting within the scope of their discretionary functions.

More recently, in *Keener v. Kimble,* 170 Ga.App. 674, 317 S.E.2d 900 (1984), the Georgia Court of Appeals reviewed a case in which two sheriff's deputies were alleged to have negligently conducted a high-speed chase that resulted in the death of plaintiff's decedents. The *Keener* court did refer to the case of *Nelson v. Spaulding County, supra,* note 24 (discussing the ministerial/discretionary-act dichotomy), and found that, in the case before it, "[a]ppellants' allegations . . . [had] raised a factual question as to whether the deputy sheriffs were engaged in the performance of a ministerial act in which they acted negligently in endangering the lives and property of others." However, the holding in *Keener* was, essentially, that the trial judge had *erred* when, on unrelated grounds, it refused to allow the issue of negligence to go to the jury. Indeed, it appears clear that the *Keener* court assumed the acts involved to have been ministerial, 170 Ga.App. at 676, 317 S.E.2d 900, and that the court's reference to *Nelson v. Spaulding County* (and the suggestion that either a legal or a jury issue might be raised with respect to the ministerial or discretionary nature of a law enforcement officer's acts) were gratuitous. At any rate, in light of the great weight of authority supporting the view that law enforcement officers do not perform discretionary functions and that they therefore or otherwise are not entitled to the protections of official immunity, this Court does not believe that the section of the *Keener* decision just discussed should be read broadly.[28]

27. *See, e.g., City of Cumming v. Chastain,* 97 Ga.App. 13, 102 S.E.2d 97 (1958) (where city police officer allegedly shot plaintiff without justification, city would not be held liable, for "[a] municipal corporation is not liable for the wrongdoing or negligence of its police officers in the discharge of their ministerial duties."); *see generally Acker v. City of Elberton,* 176 Ga. App. 580, 581, 336 S.E.2d 842 (1985) (in action alleging false arrest and imprisonment, city not liable for torts of policeman):

"[A]n employee who commits a wrongful or tortious act violates a duty he owes to one who is injured and is personally liable, even though his municipal employer may be exempt from liability under the doctrine of governmental immunity." *Foster v. Crowder,* 117 Ga.App. 568, 569–70 [161 S.E.2d 364] (1968).

"A municipal corporation is not liable to an action for damages for the illegal arrest of a citizen by one of the police officers of the city. For such arrest the officer himself is liable." *Cook v. Mayor & Council of Macon,* 54 Ga. 468 (1875).

28. That a law enforcement officer should be considered under federal law to be performing discretionary functions under certain circumstances, *see generally Brown v. Clewiston,* 644 F.Supp. 1417 (S.D.Fla.1986), but that he should not be so considered for purposes of state law is not so anomalous as it might initially appear. Under Georgia law, the determination that an official has acted in a discretionary capacity *automatically* entitles the official to immunity for all but malicious, wanton, etc., acts. State law, therefore, involves a *one-step inquiry* and

■ Accordingly, defendant Spikes's motion for summary judgment on grounds of "official immunity" with respect to plaintiff's state law claim is denied.

### B. *Remaining Defendants*

Still for resolution are the questions whether the remaining defendants are entitled to summary judgment with respect to plaintiff's § 1983 claims and, if so, whether the Court should dismiss plaintiff's pendent claims against these defendants. In the brief analysis that follows, the Court addresses first the potential liability of defendants Lanier, Maulden and Johnson in their individual capacities, and then turns to the plaintiff's claims against Sheriff Findley in his individual and official capacities.[29]

#### 1. Defendants Lanier, Maulden and Johnson

■ Plaintiff's motion in opposition to the county defendants' motion for summary judgment includes only one page of argument in support of his § 1983 and state law claims against defendants Lanier, Maulden and Johnson. Plaintiff alleges that these defendants violated, *inter alia,*[30] his right to be free from "unlawful deten-

---

grants the recipient of the privilege an immunity that can be defeated only by a plaintiff who can bear the heavy burden of proving subjective bad faith. Federal qualified immunity, on the other hand, in addition to providing a fundamentally different sort of protection from that available under state law, requires that an official prove *both* that he acted in his "discretionary" capacity, *and* that the rights alleged to have been violated were not clearly established or that it was reasonable for him not to have known of the right. Entitlement to federal qualified immunity, thus, involves a two-step inquiry. And, while a greater range of activities may be deemed discretionary under federal law, the official invoking federal qualified immunity will only rarely be entitled to automatic protection thereunder, where "clearly established rights" are implicated.

Of course, the finding that an officer performs ministerial functions under state law does not deprive him of defenses—nor does a determination that the officer is not entitled to "qualified immunity from suit" under federal law. *See supra* note 20. Indeed, in the instant case, the standards by which defendant Spikes's conduct will be measured, and the defenses available to him, will be essentially identical under state and federal law. In defending against the state claim, the burden of establishing justification (an affirmative defense) with respect to the shooting of the plaintiff is on the defendant. Similarly, while plaintiff must make out a prima facie § 1983 case of unreasonable seizure against the defendant as to his fourth amendment claim, ultimately the burden of proving probable cause/reasonableness is on the defendant. *Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985); *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34, 39–40 (2d Cir.1985); *Losch v. Borough of Parkesburg,* 736 F.2d 903, 909 (3d Cir.1984); *cf. Wing v. Britton,* 748 F.2d 494 (8th Cir.1984). Thus, even though it may be said that, for purposes of federal law, defendant Spikes was performing a discretionary function, it is apparent that there is no unfairness in deeming his acts ministerial with respect to state law.

**29.** These defendants have also invoked the qualified immunity defense. For the reasons stated, *supra,* with respect to defendant Spikes's attempted invocation of the privilege, the Court does not find it appropriate to consider the qualified immunity defense *per se:* the rights alleged to have been violated are all "clearly established." The Court examines only whether these defendants are entitled to summary judgment on the merits.

It should be noted that the conduct under consideration in this portion of the Court's Order was engaged in by defendant Spikes, as well as by the county defendants. However, because the discussed conduct does not give rise to any constitutional claim, and because the Court ultimately determines that exercise of pendent jurisdiction over any remaining state claims against the county defendants would be inappropriate, matters are simplified by omitting reference to defendant Spikes's involvement in the matters evaluated here, except where necessary.

**30.** Plaintiff also alleges a violation of his "right to be free from unlawful interference by law enforcement officials, ... [which is] actionable under Section 1983." Perhaps this right is actionable; perhaps it is not. The Court cannot at present recall a recent case wherein a violation of this right was alleged to have occurred. In any event, the Court does not feel constrained, where no citation of authority has been provided, to engage in original research on the issue. Insofar as the claim may be an attempt to allege a violation of substantive due process, the Court notes simply that there is absolutely no evidence, let alone a genuine issue of material fact, as to a substantive due process claim. Even if it could be said that these officers in some way physically or otherwise applied undue force against the plaintiff, it is clear that the officers certainly did not act "maliciously and sadistically for the very purpose of causing harm." *Gilmere v. City of Atlanta, supra,* 774 F.2d at 1501.

tion." The Court assumes that plaintiff means to allege either that the defendants are joint tortfeasors with respect to the unreasonable seizure/shooting that defendant Spikes is claimed to have effected, or that the detention of the plaintiff inside of Thompson's Store itself amounted to an actionable deprivation of a liberty interest without due process of law.

 As to the first of these alternatives, it may be true that "[e]ven nonsupervisory officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under section 1983." *Smith v. Heath,* 691 F.2d 220, 225 (6th Cir.1982); *see also Grandstaff v. City of Borger, Texas,* 767 F.2d 161, 167 (5th Cir.1983) ("The firestorm that killed [plaintiff's decedent] was in all respects a joint operation ..."; policemen held jointly liable notwithstanding absence of proof as to who fired fatal shot). However, with respect to the shooting of plaintiff by defendant Spikes, it can hardly be said that the county defendants participated in this allegedly unreasonable seizure. Nor would it be reasonable to believe that the county officers or Constable Johnson stood by and watched as defendant Spikes wilfully violated the civil rights of another: defendant Spikes's action was swift and unanticipated by anyone prior to its occurrence. Even if it were to be argued that acts on the part of the county officers in some way "caused" the ultimate seizure of plaintiff by defendant Spikes, the "causal link" between the officers' acts and Spikes's shooting of the plaintiff is so weak as to warrant little serious attention.[31] If plaintiff means to assert some general claim of negligence in this connection, clearly such a claim is not actionable under § 1983. *See generally Dunster v. Metropolitan Dade County,* 791 F.2d 1516

(11th Cir.1986); *Cannon v. Taylor,* 782 F.2d 947 (11th Cir.1986).

The second possible reading of plaintiff's allegations deserves somewhat closer scrutiny, although here also no violation of constitutional rights can be discerned. For purposes of the following analysis, the Court assumes the claim to be that the officers collectively seized the plaintiff by detaining him against his will inside Thompson's Store.

As was stated in *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), a person has been seized "whenever a police officer accosts an individual and restrains his freedom to walk away." Along similar lines, the Supreme Court noted, in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), that "a person has been 'seized' within the meaning of the Fourth Amendment ... if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Of course, the Fourth Amendment prohibits only unreasonable seizures, and reasonableness is determined by examining, *inter alia,* "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra,* 392 U.S. at 20, 88 S.Ct. at 1879.

 In the case *sub judice,* then, the Court must determine at the outset whether a seizure, separate and apart from the shooting of the plaintiff, was effected by the defendant officers. First, it seems clear that no seizure took place prior to the time that defendant Spikes fired his shotgun blast. At all times prior to that occurrence, the occupants of the store believed that they were free to leave the building

---

**31.** Proof of a "causal link" between the acts of a *supervisory* official and the violation of a plaintiff's civil rights is required before such an official may be held liable for the violation. *See Jasinski v. Adams,* 781 F.2d 843 (11th Cir.1986); *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1986); *Wilson v. Attaway, supra,* 757 F.2d at 1241–42; *Goodson v. City of Atlanta,* 763 F.2d 1381 (11th Cir.1985). It would seem

reasonable to require proof of at least such a "causal link" between the acts of nonsupervisory officers present at the scene and the ultimate violation. Where there is no showing that an officer participated in, indifferently observed, or could have acted in such a way as to prevent, a deprivation of civil rights, justice would not be served by holding him liable for a deprivation of constitutional rights.

and believed further that the officers were present in Guyton in order to protect them from the riotous crowd gathered on the far side of Route 17. While there might exist a tenable argument to the contrary,[32] it appears that actual knowledge that one has been restrained is an essential element of a fourth amendment seizure claim. *See Mendenhall, supra; see generally Ware v. Reed*, 709 F.2d 345, 348–50 (5th Cir.1983). Moreover, that the officers allowed the other occupants of the store to depart just prior to the shooting incident, viewed in light of all of the facts presented, indicates that it is highly likely that the Thompsons would have been permitted to leave, as well, had the two men simply exited the store unarmed and said "hello" to the officers. Thus, it appears clear not only that there was no actual seizure prior to the shooting but also that, even if there was a restraint on the freedom of the occupants of the store during the time here under consideration, the lack of knowledge of such restraint precludes recovery on a fourth amendment theory.

■ The Court next turns its attention to the approximately five to ten minute period of time that elapsed between the shooting of Thompson, Sr., and the establishment of phone contact with the plaintiff's son by Deputy Lanier. The Court finds that the plaintiff was detained, and therefore seized, during this period of time. The following observations seem in order. First, that the plaintiff was not "free to walk away" became painfully clear once he had been shot. A reasonable man surely would have believed after that time that it was not safe to leave the store, and neither defendant Spikes nor the county defendants immediately communicated that such was not the case. Thus, plaintiff was

"seized" *both* by virtue of deadly force having been used against him, *and* by virtue of his "detention" inside the store after the shooting. Second, Lanier's phone conversation with Thompson, Jr. dispelled the confusion surrounding the incident, and an agreement was reached between the Thompsons and the police whereby the former would exit the store, while the police would protect them from the crowd. Thus, the Court finds that the seizure began at the moment that Thompson, Sr. was shot, and ended when Deputy Lanier contacted the plaintiff's son by telephone.

■ That the plaintiff was detained, however, does not necessarily give rise to a fourth amendment claim under § 1983. As noted, *supra*, in order to establish the occurrence of a constitutional violation, it must be shown that the seizure was unreasonable.[33] Several courts faced with circumstances somewhat similar to those present in the case at bar have outlined the appropriate analysis for determining the reasonableness of warrantless police detention in a civil rights setting. *See, e.g., Dennis v. Warren*, 779 F.2d 245, 247 (5th Cir.1985) (where "no hint of probable cause" exists, detention gives rise to a § 1983 cause of action); *Lambert v. McFarland*, 612 F.Supp. 1252, 1260 (N.D. Ga.1984) (brief detention will not necessarily give rise to § 1983 claim); *Chrisco v. Shafran*, 507 F.Supp. 1312, 1322 (D.Del. 1981) (§ 1983 claim would lie if plaintiff could prove "that the defendants, without lawful authority, intentionally detained [plaintiff] ... for any significant period of time").

The court in *Armster v. City of Riverside*, 611 F.Supp. 103 (C.D.Cal.1985), engaged in the most comprehensive discussion of the issue, basing its analysis in large part on the Supreme Court decisions

---

**32.** In connection with the common law tort of false imprisonment, Prosser attacks the Restatement view that there can be no imprisonment if the plaintiff was unaware of the restraint at the time of the alleged violation. Prosser, *Law of Torts* 42 § 11 (4th ed. 1971). *Mendenhall, supra*, would seem clearly to establish that, at least with respect to Fourth Amendment seizures, knowledge of an unreasonable seizure is an essential element of the constitutional tort. In any event, the Court's determination is not crucial to its holding for, even if it were as-

sumed that a seizure was initiated upon the arrival of the very first police car on the scene, the officers' acts were in all respects "reasonable" for purposes of the fourth amendment.

**33.** The reasonableness of the seizure of plaintiff by defendant Spikes alone, *i.e.*, the shooting of Mr. Thompson, as noted previously, shall be left for jury determination, because genuine issues of material fact remain for resolution at trial.

of *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The *Armster* decision indicates that a court, in assessing reasonableness of a detention where no actual arrest has been made, should look to: 1) whether the officers had a particularized and objective basis for suspecting the plaintiff of criminal activity; 2) whether the methods used were the least intrusive means reasonably available to verify or dispel the officers' suspicions in a short period of time; 3) whether the length of the detention was "significant" or otherwise longer than was necessary to effectuate the purpose of the stop; and 4) whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. The *Armster* court, quoting from the *Sharpe* decision, *supra,* noted also that "[a] court making this determination should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in any unrealistic second-guessing." 611 F.Supp. at 108, quoting *Sharpe, supra,* 470 U.S. at 686, 105 S.Ct. at 1576. This Court adds that the *Sharpe* court further admonished that "[t]he question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it," 470 U.S. at 687, 105 S.Ct. at 1576, and that where conduct on the part of the individual alleging a constitutional violation lengthens the period of detention such conduct should be added into the reasonableness equation. *Id.* at 687–88, 105 S.Ct. at 1576.

 In light of the foregoing, the county defendants (and Trooper Spikes) are entitled to summary judgment with respect to plaintiff's claim of unlawful detention. First, the Court holds that, as a matter of law, the information possessed by the officers was sufficient to give rise to a "particularized and objective basis for suspecting [plaintiff] of criminal activity." A reasonably competent police officer would have believed, in reliance on information transmitted by the county dispatcher and by individuals present at the scene, and with reference to plaintiff's failure to leave the store along with the other occupants thereof, that plaintiff was indeed guilty or could be suspected of criminal activity. Second, given the fact that efforts to make telephone contact were undertaken soon after the shooting and almost immediately after the arrival on the scene of Sheriff Findley, it must be acknowledged that the methods used to effect the *detention* (temporary armed surveillance outside the store pending establishment of phone contact) were the least intrusive means reasonably available to verify or dispel the officers' suspicions in a short period of time. Third, the length of the detention of the plaintiff was insignificant under the circumstances. Fourth, in light of the "swiftly developing" nature of the situation, the Court declines to second-guess the decision, made by those officers first arriving on the scene, to delay efforts at establishing phone contact until "back-up" could be obtained.

Finally, it should be noted that the evidence bears out that plaintiff's own conduct, and that of his son, contributed at least to some extent to the fact and length of the detention. Thompson, Jr.'s decision to threaten, with a shotgun, the unarmed persons who had inquired as to Joe Boy Roberson's whereabouts was the initial catalyst for this entire, sorry string of events. Plaintiff himself, in deciding to remain in the store, also with a shotgun, in order to protect his property, did little to dispel the doubts of the defendant officers with respect to his activity. Nothing precluded the plaintiff's departure from the store with the other occupants thereof just prior to the shooting and the subsequent detention, and nothing prevented the plaintiff, after the arrival of several officers at the scene, from leaving law enforcement to those legally charged with responsibility for it.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Moreover, "[s]ummary judgment procedure is properly regarded not as a disfavored pro-

cedural shortcut but rather as an integral part of the Federal Rules as a whole, which are designed 'to ensure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 276 (1986). Because no genuine issue of material fact exists with respect to the reasonableness of plaintiff's detention, the motion for summary judgment filed on behalf of defendants Lanier, Maulden and Johnson is hereby granted as to those claims brought pursuant to 42 U.S.C. § 1983.

### 2. Defendant Findley

#### a. *Individual Capacity*

 Sheriff Findley has been sued in both his individual and his official capacities. Individual capacity liability can be imposed on a supervisory official where there is a causal link between the official's acts or omissions and a constitutional violation. Such a causal link exists either where the official was personally involved in the deprivation of a constitutional right or where "a history of widespread abuse puts [him] on notice of the need for improved training or supervision, and the official fails to take corrective action." *Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir.1986). There is no evidence in the instant case of any previous incidents involving misconduct on the part of the defendant deputies supervised by defendant Findley, let alone evidence tending to show a history of "widespread abuse." In fact, the Court has reviewed the pleadings and depositions in detail, and has found that commendable and progressive movement toward supplementing officer training programs and toward increasing manpower had been initiated by Sheriff Findley prior to this incident, despite the absence of past instances of misconduct and notwithstanding that there had been no previous encounters by the sheriff's department with hostage or riot-type situations. In short, the Court is not at all convinced that the sort of conduct on which supervisory liability might be based is present in the case at bar.

More important, it has already been determined that the subordinate county officers violated no constitutional right of the plaintiff. Therefore, in order to impose liability on Sheriff Findley, it would be necessary to find a causal link between his conduct and the allegedly unreasonable seizure effected when Trooper Spikes fired his shotgun. Sheriff Findley was not present at the time of the shooting and thus can hardly be said to have been personally involved in the seizure. As to a causal link, only if a liberal interpretation of the word "supervisory" is employed can Sheriff Findley be deemed to have acted in that capacity with respect to defendant Spikes. And, in the absence of evidence tending to show that Sheriff Findley had knowledge of prior misconduct or lack of training on the part of the state trooper, it would be unreasonable to hold the Sheriff liable for any constitutional violation that Spikes might be found to have been committed.

The Court therefore grants defendant Findley's motion for summary judgment with respect to the § 1983 claims brought against him in his individual capacity.

#### b. *Official Capacity*

 Suit against the sheriff in his official capacity amounts to a suit against the county employing him. *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). While a suit against a county is generally not precluded under the Eleventh Amendment, *see generally Crane v. State of Texas*, 759 F.2d 412 (5th Cir.), *modified in other respects*, 766 F.2d 193 (5th Cir.1985), plaintiff must still establish that a custom or policy on the part of a governmental entity caused the deprivation of a constitutional right before liability will be imposed. It is clear that in the instant case that a custom or policy cannot be established in reliance on a widespread history of abuse, *cf. DePew v. City of St. Mary's*, 787 F.2d 1496 (11th Cir.1986). It appears equally clear that, despite plaintiff's resort to the failure to train argument so often invoked by those who cannot point to a history of police abuse as implicit ratification of a "custom or policy," there simply is no reasonable evidence indicating the absence of adequate training. It fol-

lows that the question whether the standard that should be employed in deciding whether a failure to train is actionable is one based on negligence, gross negligence, or deliberate indifference, *see generally Springfield v. Kibbe,* —— U.S. ——, ——, 107 S.Ct. 1114, 1121, 94 L.Ed.2d 293, 304 (1987) (O'Connor, J., dissenting) (arguing that standard should be whether inadequacy of training "amounts to deliberate indifference or reckless disregard for the consequences"), is irrelevant. Defendant Findley is entitled to summary judgment with respect to the § 1983 claims brought against him in his official capacity. *See Lanham v. Whitfield,* 805 F.2d 970 (11th Cir.1986).

### 3. Dismissal of Pendent Claims

The Court expresses no opinion as to whether plaintiff may have a viable negligence claim against the county defendants. Whether he does is a matter that can be pursued in state court, where an action brought by plaintiff against these defendants is currently pending. While retention of pendent state claims after federal claims have been found to be without merit is often appropriate where, *inter alia,* statute of limitations problems exist in connection with access to the state court system, *see, e.g., Nelson v. Greater Gadsden Housing Authority,* 802 F.2d 405 (11th Cir.1986); *Emory v. Peeler,* 756 F.2d 1547 (11th Cir. 1985), such problems are obviously not present in the instant case. In addition, it would appear to the Court that, if the state law negligence issues with respect to the county defendants were tried together with the state and federal law claims against defendant Spikes, the rights of the former defendants might well be prejudiced. In other words, in this case, consolidated trial of all issues against all defendants would not necessarily promote the ends of justice. Moreover, because the instant Order, insofar as it addresses the liability of defendant Spikes, may be appealed, it would be unfair to subject the county defendants to additional uncertainty, when their potential liability can be addressed, perhaps far more swiftly, in state court, where the claims against them belonged in the first instance. The Court will not retain jurisdiction over the claims against defendants Findley, Lanier, Maulden and Johnson.

### III. CONCLUSION

For the reasons stated, it is hereby ORDERED that:

1) Defendant Spikes's motion for summary judgment as to the § 1983 official capacity claims against him is GRANTED. However, as to plaintiff's § 1983 claims against Trooper Spikes in his individual capacity, and as to the pendent state claims brought against this defendant, the motion for summary judgment is DENIED.

2) The county defendants' motion for summary judgment on plaintiff's § 1983 claims against them is GRANTED, and the pendent claims brought under Georgia law stand DISMISSED without prejudice to plaintiff's right to pursue these claims in state court.

SO ORDERED.